# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| DAVID SHEARON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) NO. 3:15-cv-01061 |
| | ) CHIEF JUDGE CRENSHAW |
| COLEMAN WOMACK et al., | ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

After David Shearon was rear-ended on Gallatin Road, Officer Coleman Womack arrested Shearon for driving under the influence of alcohol or drugs and commenced a criminal prosecution that was ultimately dismissed when Shearon's blood alcohol level was confirmed to be 0%. From that incident, Shearon brings the instant civil rights action under 28 U.S.C. § 1983 against Womack and the Metropolitan Government of Nashville, Davidson County, Tennessee ("Metro"). (Doc. No. 1.) Before the Court is Womack's Motion for Summary Judgment.[1] (Doc. No. 52.) For the following reasons, Womack's Motion is denied.

I.  UNDISPUTED FACTS

On October 15, 2014, Eric Jennings rear-ended Shearon at the intersection of Gallatin Road and Seymour Avenue in Nashville, Tennessee. (Doc. No. 63 at 1.) Shearon called 9-1-1 and the operator asked if there were any injuries during the accident, to which Shearon responded that there were not. (Doc. No. 63 at 1; Ex. 32.) The 9-1-1 operator then instructed Shearon to call the Metro Police Department's non-emergency phone number. (Doc. No. 63 at 1.) Shearon also asked

---

[1] In light of the accompanying Order granting the unopposed motion to bifurcate the trial, the Court will issue a decision on Metro's Motion for Summary Judgment (Doc. No. 48) after the trial between Shearon and Womack.

if he could move his car to the side of the road, and the 9-1-1 operator said he could if he could do so safely. (Ex. 32.) Shearon then moved his car to the Burger King side of Seymore Avenue next to the grassy area of Gallatin Road, and Jennings moved his car the opposite side of Seymore Avenue. (Doc. No. 48-1 at 5-6.) Shearon was in possession of two firearms, one on his person and another in his car. (Doc. No. 63 at 3.)

Shearon then called the non-emergency phone number. (Doc. No. 63 at 2; Ex. 33.) The operator again asked if there were any injuries, to which Shearon responded that there were none. (Doc. No. 63 at 2; Ex. 33.) The operator stated that she would dispatch an officer to the scene to make a report. (Ex. 33.)

After waiting for a long period of time, Womack arrived at the scene of the accident. (Doc. No. 48-1 at 4.) Upon arrival, Jennings began talking to Womack. (Doc. No. 48-1 at 5.) Shearon was "stunned and shocked" that the officer spoke with Jennings before Shearon because he was the one who was rear-ended. (Doc. No. 48-1 at 6.) He started walking across Seymore Avenue and told Womack that he should to talk with Shearon first because he got hit. (Doc. No. 48-1 at 6.) Womack told Shearon to get out of the middle of the street. (Doc. No. 48-1 at 6.) Womack recorded Jennings' information and told him that he was free to go. (Doc. No. 48-1 at 7.)

Shearon was upset that Womack allowed Jennings to leave without giving him a ticket, and he felt he could not communicate with Womack about it because of the officer's attitude. (Doc. No. 48-1 at 7.) Shearon told Womack that he is the Master Mason in the Masonic Lodge, Metro Police Department Sergeant Kevin Shearon is his nephew, and he owns millions of dollars in real estate around the area. (Doc. No. 48-1 at 7.) Womack observed that Shearon had dilated pupils and droopy and watery eyes. (Doc. No. 48-6.) Womack then told Shearon to go to the Burger King parking lot. (Doc. No. 48-1 at 8.)

Womack asked Shearon if he had taken any drugs that day, to which Shearon replied that he had not. (Doc. No. 48-1 at 9.) Womack then had Shearon go through two field sobriety tests for driving under the influence. (Doc. No. 63 at 2-3.) Shearon informed Womack that he had an injured foot, but he was willing to do the tests. (Doc. No. 48-1 at 9.) During the "Walk and Turn" test, where Shearon had to walk along a straight line and then turn around and walk back, Shearon stepped off the line once, maybe twice. (Doc. No. 48-1 at 10.) During the "One Leg Stand" test, Shearon was able to stand on each leg for twenty seconds. (Doc. No. 68-19 at 40-41.) He may have raised his arms during both tests in order to maintain his balance. (Doc. No. 68-19 at 43.) After the tests, Womack arrested Shearon and drove him to the Nashville General Hospital for a blood draw. (Doc. No. 68-19 at 55.) Womack then drove Shearon to the Criminal Justice Center, where Womack charged Shearon with Driving Under the Influence, in violation of Tennessee Code Annotated § 55-10-401, and Possession of a Handgun While Under the Influence, in violation of Tennessee Code Annotated § 39-17-1321. (Doc. No. 48-8 at 1-2.) After two hours, Shearon was released for $35 on a Pretrial Release Agreement. (Doc. No. 48-9.)

Shearon attended one or two court hearings per month. (Doc. No. 68-19 at 68.) At each court hearing, the District Attorney would ask to continue the case until the test results came back from the blood draw. (Doc. No. 68-19 at 68.) On June 2, 2015, once the blood results confirmed that Shearon did not have any drugs in his system, the District Attorney dismissed the case. (Doc. No. 68-19 at 69.)

II.     QUALIFIED IMMUNITY ANALYSIS

Womack moves for summary judgment on both the false arrest and malicious prosecution claims on the basis of qualified immunity. (Doc. No. 54.) Qualified immunity is an "immunity from suit" available to government officials performing discretionary functions, Pearson v.

Callahan, 555 U.S. 223, 237 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), protecting them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Womack argues he is entitled to qualified immunity on both counts because there was probable cause to arrest Shearon for both charges, and additionally on the malicious prosecution claim because he was not deprived any liberty. (Doc. No. 54.)

A. STANDARD

The Supreme Court set forth the standard for qualified immunity suits:

In [Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001)], this Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U.S., at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Ibid. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. Anderson, at 640, 107 S.Ct. 3034.

Pearson, 555 U.S. at 232. In evaluating if a defendant is entitled to qualified immunity, the Court must adopt "the plaintiff's version of the facts . . . unless the plaintiff's version is 'blatantly contradicted by the record, so that no reasonable jury could believe it." Soudemire v. Mich. Dept. of Corr., 705 F.3d 560, 565 (6th Cir. 2013) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The plaintiff "has the burden to prove that a right is clearly established." Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009) (citing Barrett v. Steubenville City Sch., 388 F.3d 967, 970 (6th Cir. 2004)). When, on summary judgment, "the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury," then summary judgment must be denied. Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir. 2007)(quoting Brandenburg v. Cureton,

882, F.2d 211, 216 (6th Ci. 1989)). Tennessee applies the same qualified, or "good faith," immunity standard and analysis to state law torts. Willis v. Neal, 247 F. App'x 730, 745 (6th Cir. 2007) (citing Rogers v. Goodling, 84 F. App'x 473, 477 (6th Cir. 2003)).

B. CLEARLY ESTABLISHED LAW

Shearon brings two federal claims against Womack, alleging violations of 42 U.S.C. § 1983: (1) false arrest, and (2) malicious prosecution, both of which are closely established under the Fourth Amendment. Unlawful arrest and malicious prosecution are two separate claims under the Fourth Amendment. Sykes v. Anderson, 625 F.3d 294, 308 (6th Cir. 2010) (quoting Barnes v. Wright, 449 F.3d 709, 715–16 (6th Cir. 2006)). To prove a false arrest claim, Shearon must prove that the "arresting officer lacked probable cause to arrest the plaintiff." Id. at 305 (quoting Voyticky v. Vill. of Timberlake, OH., 412 F.3d 669, 677 (6th Cir. 2005)). To prove a claim of malicious prosecution under the Fourth Amendment, a plaintiff must prove four elements: (1) "a criminal prosecution was initiated against the plaintiff and [ ] the defendant made, influenced, or participated in the decision to prosecute;" (2) there "was a lack of probable cause for the criminal prosecution;" (3) "as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure;" and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." Sykes, 625 F.3d at 308.

Shearon also brings false arrest and malicious prosecution claims under Tennessee state law against Womack. To prove his Tennessee false arrest claim, the plaintiff must prove "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." Coffee v. Peterbilt of Nashville, Inc., 795 S.W.2d 656, 659 (Tenn. 1990). To prove his Tennessee malicious prosecution claim, Shearon must prove: (1) a prior suit or judicial proceeding was

5

instituted without probable cause; (2) defendant brought such prior action with malice; and (3) the prior action was finally terminated in the plaintiff's favor. Roberts v. Fed. Express Corp., 842 S.W.2d 246, 247-48 (Tenn. 1992).

C. PROBABLE CAUSE

A finding that probable cause existed for Womack to arrest Shearon would defeat all of his claims because if there was no probable cause to arrest there would be no probable cause for criminal prosecution. Sykes, 625 F.3d at 305 (6th Cir. 2010) (false arrest claims); Voyticky v. Vill. of Timberlake, 412 F.3d 669, 675 (6th Cir. 2005) (malicious prosecution claims); Roberts, 842 S.W.2d at 247-48 (Tennessee malicious prosecution); Brown v. Christian Bros. Univ., 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) (Tennessee false arrest). Probable cause for an arrest exists when the "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Mich. v. DeFillippo, 443 U.S. 31, 37 (1979). Womack argues that probable cause to arrest exists because the undisputed facts show that Shearon had dilated pupils and droopy, watery eyes; he used his arms on the walk-and-turn test and the one leg stand; he stepped off the line once or twice during the walk-and-turn test; and he stumbled at times.[2]

The Sixth Circuit has foreclosed Womack's arguments that he is entitled to qualified immunity for lack of probable cause. In Miller v. Sanilac Cty., 606 F.3d 240, 245 (6th Cir. 2010),

---

[2] The warrant states that Shearon's "pupils were dilated and speech was slurred." (Doc. No. 48-8 at 1.) However, the audio recording of the two police calls do not indicate any slurred speech. (Ex. 33.) The warrant also states that Shearon "staggered," had "dry mouth," "continued to stand in the middle of the street, even after being told to move," "staggered into [Womack] twice," and "showed several signs of impairment on the one legged stand and the walk and turn." (Doc. No. 48-8 at 1.) The staggering could be explained by Shearon's foot injury, which, as explained in Section I of this Opinion, he informed Womack about at the scene. There are disputed facts on the dry mouth issue, whether he continued to stand in the middle of the street, whether he staggered into Womack, and whether his speech was slurred at the time Womack arrived at the scene. (Doc. Nos. 62, 63, and 68-19.)

the officer claimed to have smelled alcohol on the driver's breath, saw that the driver had previous drunk driving arrests, and his eyes were "glazed or glossy." Additionally, the officer administered five field sobriety tests, and determined that the driver failed all but one. Id. at 245-46. The officer arrested the driver who then took a blood test, which was negative for both alcohol and drugs. Id. at 246. The Sixth Circuit held that, while the "subsequent evidence that plaintiff had not been drinking does not vitiate the probable cause established by what the officer observed and the results of the field sobriety tests," the fact that the driver had no alcohol in his blood "casts doubt" on the officer's claim that the driver "smelled of alcohol and failed the field sobriety tests." Id. at 248. The court reversed the grant of summary judgment by the district court on the false arrest claim concluding that the totality of the circumstances created a disputed issue of material fact. Id. at 248-249.

The Sixth Circuit followed its approach in Miller when it decided Green v. Throckmorton, 681 F.3d 853 (6th Cir. 2012), two years later. In Green, the officer noticed, among other things, that the driver's pupils "were constricted," which was "abnormal." 681 F.3d at 857. The officer noted that the driver took five field sobriety tests, and failed the horizontal-gaze nystagmus test. Id. at 858. It was also undisputed with video evidence that the driver was off-balance during the one-leg stand, setting her foot down nine times and raising her arms for balance. Id. at 858. The video also showed that the driver swayed during the walk-and-turn test, using her arms for balance, and turned the wrong direction. Id. at 858-59. The officer arrested the driver for driving under the influence of alcohol or drugs, but her blood test results came back negative. Id. at 859. The Sixth Circuit again reversed the grant of summary judgment because there was a disputed issue of material fact on whether the officer had reasonable suspicion prior to administering the field sobriety tests to believe that the driver was driving under the influence. Id. at 862. It held that,

7

consistent with Miller that the subsequent negative blood test casts doubt on the claims that the driver smelled of alcohol and failed the field sobriety tests. Id. at 863. As the court explained what "matters here, rather, is . . . that a subsequent test for drugs and alcohol showed that the driver was in fact sober." Id. "That evidence alone is sufficient to cast doubt on the truthfulness of [the officer's] testimony regarding [the driver's] pupils." Id.

Here, as in Miller and Green, summary judgment is not appropriate because Shearon's blood test came back negative, which casts doubt on Womack's finding of probable cause to arrest. It is the duty of the jury to determine whether the facts supports a finding of probable cause or not. Womack is not entitled to qualified immunity on either the false arrest or malicious prosecution claims for lack of probable cause.

D.  DEPRIVATION OF LIBERTY INTEREST

Womack argues that Shearon was not deprived of a liberty interest outside the initial seizure, which is insufficient to sustain a federal malicious prosecution claim. (Doc. No. 54 at 18.) Shearon signed a "Pretrial Release Agreement," allowing him to be released for a $35.00 Pretrial Supervision Fee. (Doc. No. 48-9.) He was required to call his Pretrial Case Manager once per week while the case was pending, and be present at all scheduled court appearances.[3] (Id.)

Once again, the Sixth Circuit has addressed this issue. In Miller v. Maddox, the officer who arrested the plaintiff in 2011 sought qualified immunity on the malicious prosecution claim. 866 F.3d 386 (6th Cir. 2017).[4] In Miller, the plaintiff agreed to the same Davidson County Pretrial

---

[3] The Court notes that while Womack continues to defend this argument (Doc. No. 72), Metro has conceded it for the reasons given in the binding Sixth Circuit opinion (Doc. No. 59).

[4] The Sixth Circuit's opinion did not include the date of arrest, although it is relevant to the Court's qualified immunity decision. As such, the Court reviewed the Magistrate Judge's Report and Recommendation for the arrest date. Miller v. Maddox, No. 3:13-cv-1270, 2016 WL 5940365, at *2 (M.D. Tenn. Oct. 13, 2016), rejected by 2017 WL 35721 (M.D. Tenn. Jan. 4, 2017) (Sharp., C.J.). If the right was clearly established in 2011, it certainly was clearly established in 2014.

Release Agreement as Shearon, requiring a $35.00 fee, be required to participate in a pretrial release program, and to "show up on time for all court appearances and call the pretrial manager every week until the case was resolved." 866 F.3d at 393. The Sixth Circuit held that the officer was not entitled to qualified immunity. Id. at 395. It held that the $35.00 fee, along with the requirements "to attend court appearance" and "to check in with a case manager once per week," are sufficient to "constitute a deprivation of liberty interest apart from the initial seizure." Id. at 393. The exact factors are present here, and Shearon's arrest took place at least a year after the plaintiff's in Miller. As such, the plaintiff has established a violation of a constitutional right to support his malicious prosecution claim, that which requires denial of Defendant's motion.

III. CONCLUSION

For the foregoing reasons, Womack's Motion for Summary Judgment is denied. The Court will issue an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE